Revised March 17, 1999

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-40150
_____

JANE DOE, Individually and as next of
friend for her minor children,
Jane and John Doe, Minor Children;
JANE DOE #2, Individually and as next
of friend for her minor child,
John Doe, Minor Child, and John Doe,
Individually,

                    Plaintiffs-Appellees-Cross Appellants,

                         versus

SANTA FE INDEPENDENT SCHOOL DISTRICT, ET AL.,

                                        Defendants,

SANTA FE INDEPENDENT SCHOOL DISTRICT,

                    Defendant-Appellant-Cross Appellee.
_____

Appeals from the United States District Court for the
                Southern District of Texas
_____
                    February 26, 1999
Before JOLLY, WIENER, and STEWART, Circuit Judges.

WIENER, JR., Circuit Judge:

     In Jones v. Clear Creek Independent School District, 977 F.2d

963 (5th Cir. 1992) (Clear Creek II), we declared Clear Creek's

policy of allowing a student-selected, student-given, nonsectarian,

nonproselytizing invocation and benediction at high school

graduations ("Clear Creek Prayer Policy") not violative of the

Establishment Clause of the First Amendment to the United States Constitution. The primary questions posed by this case are: (1) whether the constitutionality of a Clear Creek Prayer Policy depends on its "nonsectarian, nonproselytizing," features, and (2) whether the venue of a Clear Creek Prayer Policy may be extended to high school football games without violating the applicable provisions of the Constitution of the United States. For the reasons that follow, we hold that (1) a public school prayer policy that, unlike a Clear Creek Prayer Policy, permits sectarian, proselytizing benedictions and invocations cannot pass constitutional muster, and (2) extending a Clear Creek Prayer Policy to cover messages delivered before a high school football games violates the Constitution even if such a policy includes the "nonsectarian, nonproselytizing" restrictions.

I
FACTS AND PROCEEDINGS

Santa Fe Independent School District ("SFISD") is a political subdivision of the State of Texas, and is governed by an elected, seven-person Board of Trustees. As its name suggests, SFISD is responsible for overseeing the public educational programs and facilities of a small community in south Texas. In performing this role, SFISD supervises over 4,000 students each of whom attends one of five schools — two primary schools, one intermediate school, one junior high school, and one high school. The plaintiffs in this action (the "Does") are several children currently or formerly

2

enrolled in SFISD schools and their parents.  In light of the sensitive nature of the action, they have been allowed to proceed anonymously.[1]

For some time prior to the onset of this litigation, the Does believed that SFISD was pursuing policies that were in contravention of the Establishment Clause.  The evidence that the Does were able to accumulate covered a wide variety of disturbing incidents and practices, but for purposes of illustration we focus on the following two items.[2]

First, in April 1993, while plaintiff Jane Doe II was attending her seventh grade Texas History class, her teacher, David Wilson, handed out fliers advertising a Baptist religious revival. Jane Doe II asked if non-Baptists were invited to attend, prompting Wilson to inquire about her religious affiliation.  On hearing that she was an adherent of the Church of Jesus Christ of Latter Day Saints (Mormon), Wilson launched into a diatribe about the non-

---

[1]A decision, we might add, that many SFISD officials apparently neither agreed with nor particularly respected. Attempts by SFISD administrators, teachers, and other employees "overtly or covertly to ferret out the identities of the Plaintiffs . . . by means of bogus petitions, questionnaires, individual interrogation, or downright 'snooping'" eventually prompted the district court to threaten to visit upon them "THE HARSHEST POSSIBLE CONTEMPT SANCTIONS" and/or "CRIMINAL LIABILITY" (emphasis in original) if they did not cease their investigations.

[2]Our recitation of the evidence, including the pseudonyms used for specific anonymous plaintiffs, is taken principally from the joint stipulations of the parties.  References to "SFISD" include the Board of Trustees, the superintendent, and other responsible administrative officials as appropriate.

3

Christian, cult-like nature of Mormonism, and its general evils. Wilson's comments inspired further discussion among Jane Doe II's classmates, some of whom reportedly noted that "[h]e sure does make it sound evil," and "[g]ee, . . . it's kind of like the KKK, isn't it?" Jane Doe II was understandably upset by this incident, and two days later, her mother, Jane Doe I, complained to SFISD. Because Wilson's actions were concededly contrary to written SFISD policies barring the distribution of religious literature in class or the verbal abuse of any student, he was given a written reprimand and directed to apologize to the Does and to his class.

Second, and of greatest significance to this case, for an undisclosed period of time leading up to and including the 1992-93 and 1993-94 school years, SFISD allowed students to read overtly Christian prayers from the stage at graduation ceremonies and over the public address system at home football games.[3] The prayers

---

[3]For example:

1994 Graduation Invocation

Please bow your heads. Dear heavenly Father: Thank you for allowing us to gather here safely. We thank you for the wonderful year you have allowed us to spend together as students of Santa Fe. We thank you for our teachers who have devoted many hours to each of us. Thank you Lord for our parents and may each one receive a special blessing. We pray also for a blessing and guidance as each student moves forward in the future. Lord, bless this ceremony and give us all a safe journey home. In Jesus's name we pray.

1994 Graduation Benediction

Our most gracious heavenly Father: We thank you for

4

were delivered as "invocations" or "benedictions" for these events, and typically were given by officers of the student council.[4]  Of course, SFISD maintained complete control over the programs and facilities during the reading of the prayers, including the ability to mute the microphone or remove the speaker.  Furthermore, the

---

> bringing us to this, our graduation.  We ask you to be with us as we start a new beginning to our lives.  Father: We express our gratitude to all that have helped us over the past three years.  Especially do we thank our parents, teachers, and friends who encouraged us, counseled us, and always extended a helping hand when needed.  Please see us safely through this night and the tomorrows of our lives.  In Jesus's name, Amen.

The record contains no examples of the football game prayers, but we may assume for purposes of this opinion that they were similar in content.  As a bit of further background, it is interesting to note that the closing paragraph of the salutatory address at the 1994 graduation was actually more proselytizing than the invocation and benediction:

> . . . There is only one thing which we as Christians can truly rely [on]: the faithfulness and strength of a loving God.  It is now that each of us must stand on a solid rock of Jesus Christ, stand up for those things on which we believe.  Even if it is alone that we must stand.  We, having done all, must continue to stand in faith remembering that Christ would have suffered and died for only one of us.  So we begin the journey of life, not a life of mediocrity and compromise, but the possible life which Christ has promised, a life of abundance and joy, being confident of this very thing, that he who has begun a good work in you will complete it until the day of Jesus Christ.  Thank You.

[4]In the case of the football games, the prayers were given by the student council "chaplain," a position created by the student-written constitution and elected by students.  It appears that at graduation the student council president customarily gave the invocation, and the secretary customarily gave the benediction.

5

text of the graduation invocations and benedictions was screened by SFISD for content prior to the ceremony.

With regard to the football games, it is undisputed that no written policy governing the invocations existed prior to the onset of litigation in this case. With regard to graduation, SFISD did draft a written policy the "June Policy"), but only in time for the 1994 ceremony. It read as follows:

> The Board shall not permit clergymen to deliver invocations or benedictions at promotional and graduation ceremonies for secondary schools; nor shall school officials direct the performance of a formal religious exercise at such ceremonies. <u>Lee et al. v. Weisman</u>, 112 S.Ct. 2649 (1992) [See also EMI]

Dated June 17, 1993

After the 1994 graduation ceremony, but before the onset of the instant litigation, SFISD amended its graduation policy (the "October Policy") to reflect more closely its interpretation of our decision in <u>Clear Creek II</u>:

> The Board shall not permit clergymen to deliver invocations or benedictions at promotional and graduation ceremonies for secondary schools; nor shall school officials direct the performance of a formal religious exercise at such ceremonies. <u>Lee et al. v. Weisman</u>, 112 S.Ct. 2649 (1992) [See also EMI (LEGAL)]
>
> The Board ***may permit*** the graduating senior class(es), with the advice and counsel of the senior class sponsor, to elect to choose student volunteers to deliver ***nonsectarian, nonproselytizing invocations and benedictions*** for the purpose of solemnizing their graduation ceremonies. <u>Jones v. Clear Creek ISD</u>, 977 F.2d 963 (5th Cir. 1992), cert. denied, 113 S.Ct. 2950 (1993).

Dated October 20, 1994

6

In April 1995, the Does filed suit against SFISD in the Federal District Court for the Southern District of Texas.[5] Citing the instances described above and others, they alleged that SFISD maintains policies and practices in violation of the Establishment Clause. They demanded prospective injunctive and declaratory relief in addition to money damages under 42 U.S.C. § 1983.

In the following month, acting in response to the Does' motion for a temporary restraining order regarding the imminent 1995 graduation ceremonies, the district court ruled that, consistent with SFISD's October Policy and our decision in Clear Creek II, student-selected, student-given, nonsectarian, nonproselytizing invocations and benedictions would be permitted, and that such invocations and benedictions could take the form of a "nondenominational prayer." Although cautioning that SFISD should play no role in selecting the students or scrutinizing and approving the content of the invocations and benedictions, the district court went on to note gratuitously that "generic prayers to the 'Almighty', or to 'God', or to 'Our Heavenly Father (or Mother)', or the like, will of course be permitted. Reference to any particular deity, by name, such as Mohammed, Jesus, Buddha, or the like, will likewise be permitted, as long as the general thrust of the prayer is non-proselytizing, as required by [Clear Creek

_____

[5]The Does also sued several members of SFISD's Board of Trustees and administrators in their individual capacities, but all of these defendants were dismissed in the early stages of the case.

II]."[6]  In anticipation of addressing the central issues of the case, the trial court also admonished that SFISD would in due course be directed to clarify a number of its Establishment Clause policies, and, in particular, "to establish or to clarify existing policies to deal with either banning all prayer, or firmly establishing reasonable guidelines to allow nonsectarian and non-proselytizing prayer at all relevant school functions."

As an initial and, by its own admission, "emergency" response to the court's order, prior to the 1995 graduation, SFISD made a few changes (the "May Policy") to its pre-litigation October Policy:

> The Board **has chosen to permit** the graduating senior class, with the advice and counsel of the senior class principal or designee, to elect by secret ballot to choose whether an invocation and benediction shall be a part of the graduation exercise.  If so chosen the class shall elect by secret ballot, from a list of student volunteers, students to deliver **nonsectarian, nonproselytizing invocations and benedictions** for the purpose of solemnizing their graduation ceremonies. Jones v. Clear Creek ISD, 977 F.2d 963 (5th Cir. 1992) cert. denied 113 S.Ct. 2950 (1993).

Dated May 23, 1995

By July, SFISD apparently had a chance to conduct a more thorough review of its fundamental position on graduation invocations and benedictions.  At this point, the May Policy was superseded by a new and, for purposes of this appeal, final version (the "July Policy"):

---

[6]Emphasis added.

8

The Board **has chosen to permit** the graduating senior class, with the advice and counsel of the senior class principal or designee, to elect by secret ballot to choose whether an invocation and benediction shall be a part of the graduation exercise. If so chosen, the class shall elect by secret ballot, from a list of student volunteers, students to deliver **invocations and benedictions** for the purpose of solemnizing their graduation ceremonies.

*If the District is enjoined by court order from the enforcement of this policy, then and only then will the following policy automatically become the applicable policy of the school district.*

The Board **has chosen to permit** the graduating senior class, with the advice and counsel of the senior class principal or designee, to elect by secret ballot to choose whether an invocation and benediction shall be a part of the graduation exercise. If so chosen, the class shall elect by secret ballot, from a list of student volunteers, students to deliver **nonsectarian, nonproselytizing invocations and benedictions** for the purpose of solemnizing their graduation ceremonies.

Dated July 24, 1995

As SFISD readily admits, the fact that the initial paragraph of this final graduation prayer policy intentionally removes the words "nonsectarian, nonproselytizing" constitutes an additional and very substantial deviation from both Clear Creek II and SFISD's October and May Policies.  Indeed, it is this deviation that ultimately forms the core of the issues before us today.

Less than two weeks later, the district court made good on its earlier suggestion and formally ordered SFISD "to finalize a unified 1st Amendment religion/expression policy addressing all issues with options in content clearly set out" by October 13.  The court also directed both parties to prepare and submit stipulations of fact by the same date.

9

In October 1995, SFISD for the first time adopted a written policy to address football game invocations. Its provisions were essentially identical to those of the July Policy on graduations. The football game prayer policy ("Football Policy") provides for a student-selected, student-given "brief invocation and/or message to be delivered during the pre-game ceremonies of home varsity football games to solemnize the event, to promote good sportsmanship and student safety, and to establish the appropriate environment for the competition." As with the July Policy on graduation, the Football Policy was to provide no further guidance as to content (i.e., no "nonsectarian, nonproselytizing" limitation) unless SFISD should be "enjoined by a court order" to do so. "Then and only then" was an alternate policy containing a "nonsectarian, nonproselytizing" content limitation to take effect automatically. On the preordained date, SFISD submitted the July Policy and the Football Policy for the court's consideration.

Pursuant to a supplemental court order, the Does and SFISD eventually submitted 131 joint stipulations of fact. In February 1996, SFISD filed a motion for summary judgment on the basis that no evidence supported the conclusion that the school district currently or formerly sanctioned a policy or practice in violation of the Establishment Clause. The Does responded to this motion, but did not file a counter motion for summary judgment.

Early in June 1996, the district court issued a broad preliminary ruling addressing many of the issues in the case.

10

Beginning with SFISD's liability for past practices, the court denied the school district's pending motion for summary judgment and instead granted summary judgment, sua sponte, in favor of the Does. Analyzing the question under the three parallel Establishment Clause tests applied by this court in Clear Creek II, 977 F.2d at 966-72, and Ingebretsen v. Jackson Public School District, 88 F.3d 274, 278-79 (5th Cir.), cert. denied sub nom. Moore v. Ingebretsen, __ U.S. __, 117 S.Ct. 388 (1996), the district court found that many of the incidents identified by the Does constituted impermissible coercion, endorsement, or purposeful advancement of religion by the State, and that SFISD could be fairly charged with having had de facto policies favoring the incidents because they "occurred amidst the School District's repeated tolerance of similar activities and oftentimes with [its] awareness and explicit approval." In reaching this conclusion, the court noted that it relied on such of the Does' factual averments as had been acquiesced in by SFISD in addition to those identified in the joint stipulations, but that the court would afford SFISD a limited opportunity to object to the liability finding at the subsequent trial on damages, which the court tentatively scheduled for mid-July 1996.

In addressing the question of prospective injunctive relief from current policies, the district court decided to grant SFISD's motion for summary judgment on that point. It ruled that, whatever may have happened in the past, SFISD had abandoned any potentially

11

problematic policies other than those concerning invocations and benedictions at graduations and football games. As to these policies, the court noted that they were essentially identical to the policies upheld by this Court in <u>Clear Creek II</u>, "except for the crucial distinction that the School District's [primary] policies do not require that any prayers delivered be nonsectarian and non-proselytizing." Because it read <u>Clear Creek II</u> as mandating this additional limitation, the court held that the initial paragraph of SFISD's July Policy and Football Policy constitutionally deficient. As each policy also contained an alternative provision that was fully consistent with <u>Clear Creek II</u>, and was specified to clutch in automatically if the court were to find the basic policy constitutionally lacking, however, the court ultimately concluded that injunctive relief would not be appropriate; the court could simply "order" SFISD to implement the fall-back provisions of the July Policy and the Football Policy. The court therefore denied the Does' request for injunctive relief of any kind.

In December 1996, following a two-day trial on damages, the district court entered its final judgment. Citing <u>Collins v. City of Harker Heights</u>, 503 U.S. 115, 120-21 (1992), and <u>Bennett v. City of Slidell</u>, 728 F.2d 762, 768 (5th Cir. 1984), the court held that imputed liability is not cognizable under § 1983, and that the Does had to prove more than the occurrence of isolated incidents to demonstrate that SFISD maintained an unconstitutional policy or

12

custom for which it could be held liable in money damages under that statute. Reversing an unclear portion of its earlier ruling, the court found that each of the incidents for which the Does claimed actual, compensable harm, particularly the David Wilson "Mormon" matter, were nothing more than isolated occurrences, and were not attributable to a policy or custom of SFISD. The court further ruled, in the alternative, that, even if the claimed incidents could be attributed to SFISD policies, the Does had failed to prove any actual, compensable harm. The court concluded by entering a take-nothing judgment against the Does. Because it also concluded that the Does were unsuccessful as to every major issue in the litigation, the court ruled that they were not prevailing parties and denied their motion for attorney's fees under 42 U.S.C. § 1988. The court stated in the alternative that, even if the Does were technically prevailing parties, it would nonetheless deny them attorney's fees as an exercise of discretion, given that their success had been so limited and that they had protracted the litigation unnecessarily by insisting on going to trial on their damage claims. From this final judgment, both SFISD and the Does timely appealed.

In its appeal, SFISD primarily challenges the district court's determination that a Clear Creek Prayer Policy must require that prayers or statements be "nonsectarian, nonproselytizing" to be constitutional. Should we be inclined to reverse the district court as to the denial of damages and attorney's fees, however,

13

then SFISD also challenges the finding of liability for past Establishment Clause violations, claiming both procedural and substantive errors on the part of the district court.

In their appeal, the Does argue that the district court erred in (1) defining "nonsectarian, nonproselytizing" to permit reference to particular deities; (2) allowing SFISD to extend a Clear Creek Prayer Policy to football games; (3) denying injunctive relief; and (4) refusing to award attorney's fees. One plaintiff, referred to above as Jane Doe II, also appeals the denial of damages for the David Wilson "Mormon" incident.

## II
## ANALYSIS

We begin with SFISD's primary argument that a Clear Creek Prayer Policy need not include the "nonsectarian, nonproselytizing" requirements to be constitutional. SFISD rests this argument on two complementary contentions: (A) the nonsectarian, nonproselytizing restrictions of <u>Clear Creek II</u> were irrelevant to the court's Establishment Clause holding; and (B) SFISD, in its July Policy, has created a <u>limited public forum</u> and, therefore, not only need not, but lawfully cannot, restrict the student speakers to nonsectarian, nonproselytizing invocations and benedictions, as such restrictions would constitute impermissible viewpoint discrimination under the Free Speech Clause.[7]

---

[7]Although for the sake of simplicity and clarity we address SFISD's arguments only as they relate to graduation ceremonies, our analysis applies with equal, if not greater, force to the Football

14

A.    The Establishment Clause

In beginning our analysis, it is well to note that our role is necessarily limited to elucidating our prior precedent in the light of its context and such subsequent clarifications as the Supreme Court has announced.  See Hogue v. Johnson, 131 F.3d 466, 491 (5th Cir. 1997) ("One panel of this Court may not overrule another [absent an intervening decision to the contrary by the Supreme Court or the en banc court . . .]."), cert. denied, __ U.S. __, 118 S. Ct. 1297 (1998).  The initial question may therefore be conveniently summarized by reviewing the holdings of Clear Creek II and its Supreme Court predecessor, Lee. By way of background, however, we first set forth the Supreme Court's three Establishment Clause tests.

1.    Three Supreme Court Tests

As we have often observed, Establishment Clause jurisprudence is less than pellucid.  We examine practices challenged on Establishment Clause grounds under three complementary (and occasionally overlapping) tests established by the Supreme Court. Clear Creek II, 977 F.2d at 963; Ingebretsen, 88 F.3d at 278.

a.    The Lemon Test

The first test, and the one of the longest pedigree, is the disjunctive three-part Lemon test, under which a government practice is unconstitutional if (1) it lacks a secular purpose; (2)

---

Policy as well.

15

its primary effect either advances or inhibits religion; or (3) it excessively entangles government with religion. Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971).

### b. The Coercion Test

The second test, which the Court announced in Lee v. Weisman, 505 U.S. 577 (1992) (invalidating school district's policy permitting school principals to invite clergy to give invocations and benedictions in form of "nonsectarian" prayer at graduation ceremonies), is commonly referred to as the Coercion Test. Under this test, school-sponsored religious activity is analysed to determine the extent, if any, to which it has a coercive effect on students. "[U]nconstitutional coercion [occurs] when: (1) the government directs (2) a formal religious exercise (3) in such a way as to oblige the participation of objectors." Clear Creek II, 977 F.2d at 970 (citation omitted).

### c. The Endorsement Test

The third test, known as the Endorsement Test, seeks to determine whether the government endorses religion by means of the challenged action. County of Allegheny v. ACLU, 492 U.S. 573 (1989). The government unconstitutionally endorses religion when "it conveys a message that religion is 'favored,' 'preferred,' or 'promoted' over other beliefs." Id. at 593.

### 2. Lee and Clear Creek II

In Lee, the Supreme Court declared a school district's policy of allowing a high school principal to invite a religious official

16

to give a nonsectarian, nonproselytizing invocation and benediction at graduation to be an unconstitutional "coercion" of participation in a state-directed religious exercise. Lee, 505 U.S. at 586. Four Justices appeared to find the policy to be an unconstitutional "endorsement" of religion as well. Id. at 604-05 (Blackmun, J., joined by Stevens & O'Connor, JJ., concurring) & 629-30 & n.8 (Souter, J., joined by Stevens & O'Connor, JJ., concurring); cf. Allegheny, 492 U.S. at 594 (discussing endorsements).

Then, in Clear Creek II, applying the three of the Establishment Clause tests set forth above, we held that Clear Creek's policy of allowing a student-selected, student-given, nonsectarian, nonproselytizing invocation and benediction at a high school graduation ceremony —— SFISD's fall-back provision in the July Policy —— did not violate the dictates of the Establishment Clause. Clear Creek II, 977 F.2d at 968-72.

SFISD asserts that a close reading of Clear Creek II reveals that the school district's graduation policy escaped the result in Lee not because of its "nonsectarian, nonproselytizing" content limitation, but rather solely because it permitted invocations and benedictions as long as they are student-selected and student-given. Inasmuch as our opinion in Clear Creek II specifically relied on the school district's requirement that the student-led graduation prayers be nonsectarian and nonproselytizing in holding that its policy did not offend the Establishment Clause, we find SFISD's reading of Clear Creek II to be specious at best.

17

First, we concluded in <u>Clear Creek II</u> that the twin restrictions served the dual functions of enhancing the graduation ceremony's solemnization, thus permitting the policy to clear <u>Lemon</u>'s secular purpose hurdle, while simultaneously reducing the possibility of endorsing religion. <u>Clear Creek II</u>, 977 F.2d at 971 ("[T]he Resolution imposes two one-word restrictions ‹nonsectarian and nonproselytizing' which enhance solemnization and minimize the advancement of religion."). Second, in <u>Clear Creek II</u>, we obviously relied on the nonsectarian, nonproselytizing nature of the prayers to determine that the BISD policy did not have the primary effect of advancing religion —— <u>Lemon</u>'s second prong. <u>Id.</u> at 967 ("Its requirement that any invocation be nonsectarian and nonproselytizing minimizes any such advancement of religion."); <u>see also</u> <u>Doe v. Duncanville Ind. Sch. Dist.</u>, 70 F.3d 402, 406 (5th Cir. 1995) (distinguishing "quintessentially Christian prayer" basketball team prayers from nonsectarian, nonproselytizing prayers in <u>Clear Creek II</u>). Moreover, as the primary-effect prong of <u>Lemon</u> "asks whether . . . the practice under review in fact conveys a message of <u>endorsement</u> or <u>disapproval</u>," <u>Lynch v. Donnelly</u>, 465 U.S. 668, 690 (1984) (emphasis added), the character of the prayer being scrutinized is clearly relevant to the Supreme Court's closely-related Endorsement Test as well. Finally, we rested our determination that the graduation prayers did not constitute a "formal religious exercise" for the purposes of <u>Lee</u>'s Coercion Test in principal part on the fact that Clear Creek's policy permitted

18

only nonsectarian, nonproselytizing prayers.  <u>Clear Creek II</u>, 977 F.2d at 971.

Thus, contrary to SFISD's conclusional suggestion, <u>Clear Creek II</u> did not hold that a policy is insulated from constitutional scrutiny under the Establishment Clause merely because it permits, rather than requires, religious speech when selected and given by students.[8]  Much more than mere window dressing, the content restrictions that SFISD now attempts to cast aside were, in fact, central to our holding in the <u>Clear Creek II</u>.[9]  More to the point, we now conclude, in obeisance to the ineluctable precedent of <u>Clear Creek II</u>, that a knock-off of a Clear Creek Prayer Policy that does not limit speakers to nonsectarian, nonproselytizing invocations and benedictions violates the dictates of the Establishment Clause.

3.   Applying the Tests

---

[8]In his dissent, Judge Jolly places great emphasis on the fact that the Supreme Court has held that the nonsectarian nature of a graduation prayer cannot resuscitate an otherwise unconstitutional graduation prayer.  We do not hold otherwise.  Rather, we simply follow <u>Clear Creek II</u>'s unmistakable conclusion that, although not sufficient, a policy's nonsectarian, nonproselytizing requirements are necessary.

[9]More generally, it is beyond peradventure that government measures that lend succor to a particular religion, denominaiton or sect fall at the very core of the conduct proscribed by the Establishment Clause.  <u>See, e.g.</u>, <u>Larson v. Valente</u>, 456 U.S. 228, 246 (1982) ("Since <u>Everson v. Board of Education</u>, this Court has adhered to the principle, clearly manifested in the history and logic of the Establishment Clause, that no State can 'pass laws which aid one religion' or that 'prefer one religion over another.'") (citation omitted); <u>Board of Ed. of Kiryas Joel Village Sch. Dist. v. Grumet</u>, 512 U.S. 687, 696 (1994) (emphasizing neutrality among religious sects is central to Establish Clause jurisprudence).

Given the posture of this case, we limit our primary discussion to those portions of the Supreme Court's three Establishment Clause tests with regard to which Clear Creek II discussed the twin restrictions. Turning first to Lemon's secular purpose requirement, SFISD argues that, as in Clear Creek II, its July Policy is designed to solemnize its graduation ceremonies. We are, of course, mindful of the deference courts typically afford a government's articulation of secular purpose. Bethel Sch. Dist. v. Fraser, 478 U.S. 675 (1986); Clear Creek II, 977 F.2d at 965-66. Nevertheless, the government's statement of secular purpose cannot be a mere "sham." Edwards v. Aguillard, 482 U.S. 578, 586-87 (1987). Here we simply cannot fathom how permitting students to deliver sectarian and proselytizing prayers can possibly be interpreted as furthering a solemnizing effect. Such prayers would alter dramatically the tenor of the ceremony, shifting its focus —— at least temporarily —— away from the students and the secular purpose of the graduation ceremony to the religious content of the speaker's prayers. Indeed, an almost inevitable consequence of permitting the uttering of such prayers would be the polarizing and politicizing of an event intended to recognize and celebrate the graduating students' academic achievements and the commonality of their presence and the path on which they are about to embark. In short, rather than solemnize a graduation, sectarian and proselytizing prayers would transform the character of the ceremony and conceivably even disrupt it.

20

The context of the evolutionary history in which SFISD developed its series of prayer policies further confirms the school district's penumbral religious purpose. As described above, SFISD first formulated an "almost" Clear Creek Prayer Policy, one which permitted students to deliver nonsectarian and nonproselytizing prayers (the October Policy); then, following the district court's initial ruling, adopted a "pure" Clear Creek Prayer Policy (the May Policy); and finally, on further reflection, created its ultimate twin-tiered policy (the July Policy), initially dropping the key content restrictions until and unless the district court should hold the primary policy unconstitutional and thereby trigger automatic implementation of the fall-back provision. As students were already permitted to deliver invocations and benedictions (even in the form of prayer) under SFISD's previously articulated policies, it is impossible to conclude that this final revision was anything but an attempt to encourage sectarian and proselytizing prayers — a purpose which is the antithesis of secular. See Ingebretsen, 88 F.3d at 279 (holding school district's policy permitting student-initiated prayer at compulsory or non-compulsory school events did not have secular purpose because (1) its clear intent was to inform students, teachers, and administrators they can pray at school events as long as student "initiated" prayer and (2) policy was passed as part of legislature's reaction to punishment of school president who championed prayer in school). Our cynicism about the school board's proffered secular purpose is

galvanized by SFISD's inclusion of the fall-back alternative that would re-insert the twin restrictions ipso facto should the district court invalidate the basic provision of the July Policy.

Second, we conclude that, when shorn of the nonsectarian, nonproselytizing restrictions, SFISD's modified Clear Creek Prayer Policy fails Lemon's primary effect prong as well. "The effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." Lynch, 465 U.S. at 690. This consideration is especially important in the context of public schoolchildren. Aquillard, 482 U.S. at 583-84; cf. Lubbock Civil Liberties Union v. Lubbock Indep. Sch. Dist., 669 F.2d 1038, 1048 (5th Cir. 1982) (holding that high school was not public forum and stating "[w]hile students have First Amendment rights to political speech in public school, sensitive Establishment Clause considerations limit their right to air religious doctrines.").

Again, in Clear Creek II, we determined that a student-led, nonsectarian, nonproselytizing prayer would serve to solemnize the graduation ceremony and thus would not have the primary effect of advancing religion. Clear Creek II, 977 F.2d at 967. As our later cases of Ingebretsen and Duncanville make abundantly clear, though, the mere fact that prayers are student-led or student-initiated, or both, does not automatically ensure that the prayers do not transgress Lemon's second prong. Ingebretsen, 88 F.3d at 279 (holding school district's policy permitting student-initiated

22

prayer at compulsory and non-compulsory school events had primary effect of advancing religion); Duncanville, 70 F.3d at 407 (distinguishing Clear Creek II and holding school officials' supervision of student-initiated and student-led prayers preceding basketball games violated Establishment Clause, in part because prayers were "quintessentially Christian"). Indeed, if subjecting a prayer policy to a student vote were alone sufficient to ensure the policy's constitutionality, what would keep students from selecting a formal religious representative, such as the rabbi in Lee, to present a graduation prayer? Indeed, to take the argument one step further, there would be no reason to deny the students the authority to designate a formal religious representative to deliver a full-fledged, fire-and-brimstone, Bible- or Koran-quoting, sectarian sermonette (in the dress for a prolonged invocation or benediction) at graduation; for, by putting the ultimate choice to the students, the sermonette would not facially bear the government's imprimatur.

But government imprimatur is not so easily masked: Prayers that a school "merely" permits will still be delivered to a government-organized audience, by means of government-owned appliances and equipment, on government-controlled property, at a government-sponsored event, thereby clearly raising substantial Establishment Clause concerns. Cf. Lee, 505 U.S. at 597 (School officials "retain a high degree of control over the precise contents of [a graduation ceremony], the speeches, the timing, the

23

movements, the dress, and the decorum of the students."); Jones v. Clear Creek Ind. Sch. Dist., 930 F.2d 416, 418 (5th Cir. 1991) ("Clear Creek I") (Graduation prayer policy "is subject to Establishment Clause scrutiny because it is the mechanism through which the state provides space in a closed forum for arguably religious speech at a government sponsored event."), vacated, 505 U.S. 1215 (1992); Jager v. Douglas County Sch. Dist., 862 F.2d 824, 831 (11th Cir. 1989) (examining school practice under Establishment Clause "[w]hen religious invocation is given via a sound system controlled by school principals and the religious invocation occurs at a school-sponsored event at a school-owned facility"). And when the school "permits" sectarian and proselytizing prayers — which, by definition, are designed to reflect, and even convert others to, a particular religious viewpoint and which, as stated above, do not serve (and even run counter to) the permissible secular purpose of solemnizing an event — such "permission" undoubtedly conveys a message not only that the government endorses religion, but that it endorses a particular form of religion.

For the very same reasons, SFISD's prayer policy obviously violates the Supreme Court's Endorsement Test as well, which asks whether the government has appeared to take a position on questions of religious belief or has conveyed a message that religion is favored, preferred, or promoted over other beliefs. Ingebretsen, 88 F.3d at 280.

Having concluded that student-selected, student-given, sectarian, proselytizing invocations and benedictions at high school graduations violate both the Lemon test and the Endorsement test, we are not required to determine that such public school prayer policies also run afoul of the Coercion Test to hold them antithetical to the Establishment Clause. We nevertheless offer the following observation for the sake of completeness.

As alluded to above, Clear Creek II held that the Clear Creek Prayer Policy did not constitute a "formal religious exercise" because (1) the prayers were not delivered by a member of the clergy, and (2) the prayers were nonsectarian and nonproselytizing. Clear Creek II, 977 F.2d at 971. Prayer, of course, is a "quintessential religious practice," Karen B. v. Treen, 653 F.2d 897, 901 (5th Cir. 1981), aff'd, 455 U.S. 913 (1982); and prayer in school raises particularly sensitive constitutional concerns. As the Supreme Court stated in Aquillard:

> The Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools. Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impressionable and their attendance is involuntary.").

Aquillard, 482 U.S. at 583-84. Only the combination of the factors relied on in Clear Creek II — that the prayer was student-led and nonsectarian, nonproselytizing — saved that school district's graduation prayers from being anathematized a "formal religious

25

exercise" for the purposes of Lee's Coercion Test. Cf. Lee, 505 U.S. at 588-90 (holding nonsectarian, nonproselytizing graduation prayer delivered by rabbi was "formal religious exercise"). Again, because sectarian and proselytizing prayers are by their very nature designed to promote a particular religious viewpoint rather than solemnize an otherwise purely secular event, they cannot find sanctuary in the tightly circumscribed safe harbor of Clear Creek II and thereby avoid the appellation "formal religious exercise."[10]

Nevertheless, as the Coercion Test is conjunctive and there is no distinguishing difference between SFISD's policy and the policy of Clear Creek ISD in Clear Creek II with regard to the test's other two prongs — government direction and obligatory participation — we need not and therefore do not belabor the point by addressing today whether SFISD's policy violates the Coercion Test. It suffices that, when stripped of one of the foundational elements on which Clear Creek II is constructed, SFISD's graduation prayer policy is so constitutionally deficient that it cannot stand. By failing to prohibit sectarian and proselytizing prayers,

_____

[10]SFISD advances the argument that, because SFISD permits but does not require prayer, such a prayer does not constitute a formal religious exercise. See Clear Creek II, 977 F.2d at 971 ("By contrast [to Lee], the Resolution tolerated nonsectarian, nonproselytizing prayer, but does not require or favor it."). This contention is wholly unpersuasive, as a religious practice derives its religious nature from its content and historical significance, not from whether it is permitted or required by the school. Neither a baptism nor a bar mitzvah, for examples, would be somehow transformed into a secular events if a school set up a procedure by which its students were permitted to vote to include such a ritual in its graduation ceremony.

26

the July Policy not only lacks a secular purpose, but has the primary effect of advancing, and unconstitutionally endorsing religion.

B.    The Free Speech Clause

Finding the landscape of Establishment Clause jurisprudence inhospitable, SFISD alternatively seeks sanctuary for its graduation prayer policy in the Free Speech Clause, a contention to which we now turn.  SFISD asserts that its July Policy survives constitutional scrutiny because through this policy it has created a "limited public forum."  This being the case, continues SFISD, it is not simply permissible for the school district to allow sectarian and proselytizing student prayers, but SFISD would be guilty of unconstitutional viewpoint discrimination were it to do otherwise.  We disagree with these assertions for the simple reason that as a matter of law SFISD has not created a limited public forum.  See American Civil Liberties Union of New Jersey v. Black Horse Pike Reg'l Bd. of Ed., 84 F.3d 1471, 1477-78 (3d Cir. 1996) (holding that school board's graduation prayer policy permitting students to vote to include prayer in graduation ceremony did not create limited public forum); Harris v. Joint Sch. Dist. No. 241, 41 F.3d 447, 456-57 (9th Cir. 1994) (same), vacated as moot, 515 U.S. 1154 (1995).

We begin with the basics.  "There are three classifications of fora."  Hobbs v. Hawkins, 968 F.2d 471, 481 (5th Cir. 1992) (quoting Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473

27

U.S. 788, 802 (1985)); Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983)).  The first category is the traditional public forum.  These are places, such as public parks and streets, "'which by long tradition or by government fiat have been devoted to assembly and debate.'"  Id. (quoting Cornelius, 473 U.S. at 802).  Second, there is "'the public forum created by government designation.'"  Id.  This type of forum "'may be created by government designation of a place or channel of communication [not traditionally open to assembly and debate] for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects.'"  Id. Finally, there is the "'nonpublic' forum."  Id. (quoting Cornelius, 473 U.S. at 803).  "This is the residual class of government-owned property, to which the First Amendment does not guarantee access." Id.

A graduation ceremony is quite obviously not a traditional public forum.  The question, therefore, under the July Policy is whether SFISD's commencement program constitutes a government designated public forum, or, more accurately, whether the portions of the commencement program allocated to the invocation and benediction constitute designated public fora. Two factors are key to determining whether the State has transformed its property into a designated public forum.  The first is governmental intent. Cornelius, 473 U.S. at 802 ("[T]he Court has looked to the policy and practice of the government to ascertain whether it intended to

28

designate a place not traditionally open to assembly and debate as a public forum"). The nature of the State property and its compatibility with expressive activity are important indicia of intent. Id. at 802; see also Arkansas Educational Television Commission v. Forbes, 118 S.Ct. 1633, 1639 (1998) (holding public television broadcasting not generally a public forum and stating in broadcasting "broad rights of access for outside speakers would be antithetical, as a general rule, to the discretion that stations . . . must exercise to fulfill their journalistic purpose and statutory obligations."); Muir v. Alabama Educ. Television Comm'n, 688 F.2d 1033, 1042 (5th Cir. 1982) ("A facility is a public forum only if it is designed to provide a general public right of access to its use, or if such public access has historically existed and is not incompatible with the facility's primary activity.").

The second factor relevant to determining whether the government has established a public forum is the extent of the use granted. See Perry, 460 U.S. at 46-47. A designated public forum may, of course, be limited to a specified class of speakers or to discussion of specified subjects —— thus the term "limited public forum." Estiverne v. Louisiana State Bar Assoc., 863 F.2d 371, 378 (5th Cir. 1989). Nevertheless, the State does not create a designated public forum "by inaction or by permitting limited discourse." Cornelius, 473 U.S. at 802 (emphasis added). To create such a forum, the government must allow "general access" to, Id. at 802, or "indiscriminate use" of, Perry, 460 U.S. at 47, the

29

forum in question by the general public, or by particular speakers, or for the discussion of designated topics.

Regarding the first factor — governmental intent — it is clear that the government's proffered intent does not govern this inquiry, else it would be a limited inquiry indeed. In the typical case, to justify a limitation it has placed on the speech of private individuals, the State asserts that it has not created a designated public forum. In the instant case, the reverse is true: SFISD attempts to evade the requirements of the Establishment Clause by running for the protective cover of a designated public forum. We must, therefore, view skeptically SFISD's own self-serving assertion of its intent and examine closely the relationship between the objective nature of the venue and its compatibility with expressive activity.

In Estiverne, we framed the relevant inquiry as: "Does the character of the place, the pattern of usual activity, the nature of its essential purpose and the population who take advantage of the general invitation extended make it an appropriate place for communication of views on issues of political and social significance?" Estiverne, 863 F.2d at 378-79. SFISD's July Policy flunks this test hands down.

Neither its character nor its history makes the subject graduation ceremony in general or the invocation and benediction portions in particular appropriate fora for such public discourse. See Brody v. Spang, 9577 F.2d 1108, 1117 (3d Cir. 1992)

30

("Graduation ceremonies have never served as forums for public debate or discussions, or as a forum through which to allow varying groups to voice their views.") (quotation and citation omitted); cf. Hays County Guardian v. Supple, 969 F.2d 111, 116-18 (5th Cir. 1992) (concluding that university campus was limited public forum because it served as central site of student body and because university's written policies established a "general policy of open access"). For obvious reasons, graduation ceremonies — in particular, the invocation and benediction portions of graduation ceremonies — are not the place for exchanges of dueling presentations on topics of public concern. See Duncanville, 70 F.3d at 406 ("The [basketball] games are school-sponsored and controlled events that do not provide any sort of open forum for student expression . . . ."). Such presentations would undoubtedly clash with a ceremony's "primary activity." See Muir, 688 F.2d at 1042. Indeed, a graduation ceremony comprises but a single activity which is singular in purpose, the diametric opposite of a debate or other venue for the exchange of competing viewpoints.

It is not surprising then that SFISD has not, in fact, opened the ceremony to such exchanges, which brings us to the second relevant factor — extent of use. In no way can SFISD be said to have granted "general access" to a class speakers at its graduation ceremony. Rather, it has simply concocted a thinly-veiled surrogate process by which a very limited number of speakers — one or two — will be chosen to deliver prayers denominated as

31

invocations and benedictions. These speakers, moreover, will not be given free reign to address issues, or even a particular issue, of political and social significance. Rather, they will be chosen to deliver very circumscribed statements that under any definition are prayers. See Webster's Third New International Dictionary at 1190 (defining "invocation" as "the action or an act of petitioning for help or support") & 203 (defining "benediction," similarly, as "an expression or utterance of blessing or good wishes") (1993). SFISD has thus granted no one, not even the students elected to give the invocations and benedictions, "indiscriminate use" of its government controlled channel of communication. Perry, 460 U.S. at 47; see also Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 270 (1988) (holding that school-run student newspaper was not designated forum because school officials "did not evince either by policy or practice any intent to open the pages of [newspaper] to indiscriminate use by its student reporters and editors, or by the student body generally") (quotations and citations omitted).

In short, even though the government may designate a forum only for particular speakers or for the discussion of particular topics, Cornelius, 473 at 802, SFISD's restrictions so shrink the pool of potential speakers and topics that the graduation ceremony cannot possibly be characterized as a public forum — limited or otherwise —— at least not without fingers crossed or tongue in cheek. Cf. Forbes, 118 S.Ct. at 1640 (1998) (holding candidate debates constitute narrow exception to general rule that public

32

broadcasting does not constitute public form because (1) "debate was by design a forum for political speech by candidates," and (2) candidate debates are, by tradition, of exceptional significance in electoral process); Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 770 (1995) ("Religious expression cannot violate the Establishment Clause where it (1) is purely private and (2) occurs in a traditional or designated public forum, publicly announced and open to all on equal terms.") (emphasis added).

Clear Creek II does not hold to the contrary. Although our opinion in that case does advert to Board of Education of Westside Community Schools v. Mergens, 496 U.S. 226 (1990), which rests, in part, on public forum analysis, Clear Creek II does not rely on Mergens for the conclusion that the Clear Creek ISD had created a public forum. Rather, Clear Creek II adverts to Mergens only within the limited context of its Endorsement Test analysis, concluding that the graduation prayer policy at issue "paralleled" the practices held constitutional in Mergens.[11] Clear Creek II, 977

---

[11]There is, moreover, a crucial distinction between the speech involved in Mergens and the speech that SFISD's policy would allow. In Mergens, the Court held that permitting the Christian student organization to meet on school grounds after class and to recruit members through the school newspaper, bulletin boards, and public address system, did not violate the Establishment Clause. Thus, the organization was not permitted to deliver a religious message directly to the student body. The religious organization did not use any of the various methods of communication controlled by the school to proselytize —— or to deliver religious messages of any nature —— but rather confined such activities to meetings held after class with virtually no trace of governmental imprimatur. Clear Creek II took Mergens one baby step closer to the brink, allowing delivery of prayer to the student body but only if such

F.2d at 968-69.  Indeed, nowhere in the Clear Creek II opinion does the term "public forum" even appear.

This should surprise no one.  For, if a graduation program, open, as it is, to such a limited number of student-elected or selected speakers, constitutes a limited public forum, the graduation prayer policy blessed in Clear Creek II would, in fact, be unconstitutional — not, however, as a violation of the Establishment Clause, but as impermissible viewpoint discrimination: Once the State has established a limited public forum, it cannot discriminate against speech because of the message, even if that message is religious in nature.  Rosenberger v. Rector & Visitors of the Univ. of Virginia, 515 U.S. 819, 828-31 (1995) (holding unconstitutional university's decision to deny generally-available school funds to student organization publishing newspaper because of newspaper's Christian editorial viewpoint); Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 393-96 (1993) (holding unconstitutional school's policy of denying school facilities to group desiring to show film series addressing child-rearing questions from a "Christian perspective" as impermissible viewpoint discrimination).  Thus, if public forum analysis were applicable, then Clear Creek's proscription of prayer

_____

prayer were nonsectarian and nonproselytizing.  SFISD's July Policy, however, would plunge over the cliff, by permitting students to present overtly sectarian and proselytizing religious prayers to a group of students clearly assembled at the behest of the government.

34

that is sectarian and proselytizing would violate the First Amendment after all, but would do so on grounds we never considered in Clear Creek II.[12]

In sum, our Clear Creek II opinion explicitly —— and (we are bound by stare decisis to acknowledge) correctly —— relies on Clear Creek ISD's nonsectarian, nonproselytizing restrictions to dodge

---

[12]Judge Jolly accuses us of unprecedentedly permitting the government to review (and thus control) the content of citizens' purely private speech (in the form of prayer) to determine whether that speech transgresses the required nonsectarian, nonproselytizing restrictions. Judge Jolly's accusation, however, only serves to highlight that Clear Creek II did not hold that the school district had created a public forum. In that decision, we explicitly approved a school district's review of the content of the student-initiated, student-led graduation prayers. Clear Creek II, 9777 F.2d at 967 ("We know of no authority that holds yearly review of unsolicited material for sectarianism and proselytization to constitute excessive entanglement."). Judge Jolly is thus faced with a dilemma —— either, contrary to his assertions, we did not hold in Clear Creek II that the school district created a public forum or, as Judge Jolly argues, we did so hold, but additionally approved the type of governmental review he now condemns.

Because (1) we do not believe that the student-initiated, student-led invocation and benediction portions of a graduation ceremony satisfy the requirements of a public forum, (2) the Clear Creek II opinion never once utters the term "public forum" despite its consideration of Mergens, a public forum case, and (3) the Clear Creek II opinion explicitly approves the school district's review of the students' graduation prayers for sectarianism and proselytization, a review that would undoubtedly constitute impermissible viewpoint discrimination if the students' graduation prayers constituted purely private speech, we will not, as Judge Jolly urges, strain to read our earlier decision to hold contrary to its plain language that the school district had carved out a limited public forum. Whether or not we agree with Clear Creek II's conclusion that the student-led graduation prayers do not transgress the Establishment Clause even though they do not constitute private speech, we are bound by its judgment unless and until this Court reconsiders the matter en banc or the Supreme Court holds otherwise.

35

the outcome otherwise dictated by Lee. Without these twin restrictions, a Clear Creek Prayer Policy cannot withstand constitutional scrutiny. Moreover, SFISD cannot escape this result by piously wrapping itself in the false banner of "limited public forum." The July Policy created no forum at all and therefore could not, and did not, trigger the First Amendment's prohibition of viewpoint discrimination. The limited number of speakers, the monolithically non-controversial nature of graduation ceremonies, and the tightly restricted and highly controlled form of "speech" involved, all militate against labeling such ceremonies as public fora of any type. Absent feathers, webbed feet, a bill, and a quack, this bird just ain't a duck!

The district court, therefore, did not err in rejecting SFISD's stretch to reach limited public forum status for its graduation and through it find viability for the July Policy in the Free Speech Clause. Neither did the court err in holding that provisions of the initial paragraph of SFISD's July Policy violates the Establishment Clause or in ordering SFISD to institute the fall-back alternative — a pure Clear Creek Prayer Policy — in its stead.

We need only note briefly that the district court did, however, clearly err in overbroadly defining "nonsectarian" to include reference to specific "deities," see, e.g., Webster's Third New International Dictionary at 1538 (defining "nonsectarian" as "not restricted to or dominated by a particular religious group"),

36

a mistake the district court can easily correct on remand. A nonsectarian, nonproselytizing prayer that, for example, invokes the name of Buddha or Mohammed or Jesus or Jehovah is an obvious oxymoron.

C. Football Games

Having concluded that SFISD's modified Clear Creek Prayer Policy does not pass constitutional muster, we must next address whether the pure Clear Creek Prayer Policy embodied in the alternative fall-back provision of the policy can be extended to football games through the Football Policy. In Duncanville, we confronted virtually the identical issue. There, the district court had enjoined employees of the school district from, inter alia, supervising student-initiated, student-led prayers during athletic events. Duncanville, 70 F.3d at 406. In upholding the injunction, we distinguished Clear Creek II, stating:

> In concluding that [the Clear Creek] resolution did not violate the Establishment Clause, we emphasized that high school graduation is a significant, once-in-a-lifetime event that could appropriately be marked with a prayer, that the students involved were mature high school seniors and the challenged prayer was to be non-sectarian and non-proselytizing. Here, we are dealing with a setting [football and basketball games] far less solemn and extraordinary, a quintessentially Christian prayer, and students of twelve years of age . . . ." Id.

SFISD argues that the present case is more closely analogous to Clear Creek II than to Duncanville because in the latter the students spontaneously initiated the prayers in question, whereas here, as in Clear Creek II, they do so by vote. SFISD's argument,

37

however, widely misses the mark. The controlling feature here is the same as in <u>Duncanville</u>: The prayers are to be delivered <u>at football games</u> — hardly the sober type of annual event that can be appropriately solemnized with prayer. The distinction to which SFISD points is simply one without difference. Regardless of whether the prayers are selected by vote or spontaneously initiated at these frequently-recurring, informal, school-sponsored events, school officials are present and have the authority to stop the prayers. Thus, as we indicated in <u>Duncanville</u>, our decision in <u>Clear Creek II</u> hinged on the singular context and singularly serious nature of a graduation ceremony. Outside that nurturing context, a Clear Creek Prayer Policy cannot survive. We therefore reverse the district court's holding that SFISD's alternative Clear Creek Prayer Policy can be extended to football games, irrespective of the presence of the nonsectarian, nonproselytizing restrictions. See <u>Jager</u>, 862 F.2d at 832-33 (holding "equal access" policy for football game invocations unconstitutional).

D.   Injunctive Relief

Turning next to the Does' equitable claim, we review the district court's denial of an injunction for abuse of discretion. <u>Lubbock</u>, 669 F.2d at 1049. As we agree with the district court that it can simply order SFISD to put into effect the fall-back alternative of the July Policy, we address only whether the Does are entitled to injunctive relief regarding SFISD's other practices. The district court expressly found that SFISD had

ceased all such unlawful practices. Given a trial court's greater ability to evaluate the evidence regarding a defendant's future propensity to engage in proscribed activities, we are generally reluctant to overturn a denial of injunctive relief. Id. (refusing to reverse trial court's denial of injunctive relief even though defendant had engaged in impermissible practices over several years and only ceased on eve of trial); Meltzer v. Board of Pub. Instruction of Orange County, 548 F.2d 559, 562-568 (5th Cir. 1977) (refusing to reverse district court's denial of injunctive relief even though school district had proved very reluctant to comply with constitutional requirements of Establishment Clause), aff'd on rehearing, 577 F.2d 311 (1978). The Does, moreover, point to no evidence in support of their contention that a threat of future unconstitutional practices exists other than the fact of SFISD's removal of the "nonsectarian, nonproselytizing" language from its final graduation and football game policies, a threat negated by the district court in ordering implementation of the fall-back alternative and extinguished by us in this appeal. We therefore conclude that the district court's denial of injunctive relief was not an abuse of discretion.

E.  Attorney's Fees

Under § 1988, the district court may make an award of attorney's fees only if it determines that the claimant is a "prevailing party." Walker v. HUD, 99 F.3d 761, 767 (5th Cir. 1996); Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). A party

prevails when he succeeds on "any significant issue in litigation which achieve[s] some of the benefit [he] sought in bringing suit." <u>Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.</u>, 489 U.S. 782, 791 (1989) (quoting <u>Nadeau v. Helgemoe</u>, 581 F.2d 275, 278-79 (1st Cir. 1978)). "The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." <u>Id.</u> at 792-93.

In this case, the Does have obtained a judgment vindicating the Santa Fe students' important First Amendment rights in both graduation ceremony and football game contexts. They "have thus served the 'private attorney general' role which Congress meant to promote in enacting § 1988." <u>Garland</u>, 489 U.S. at 793; <u>see also Hall v. Board of Sch. Comm'rs of Conecuh County</u>, 656 F.2d 999, 1003 (5th Cir. 1981) (holding plaintiffs who prevailed on claims that high school's morning devotional readings over public address system and teaching elective Bible literature course were violative of Establishment Clause were entitled to attorney's fees). Accordingly, on remand the district court shall award the Does reasonable and realistic attorney's fees as prevailing parties.

F.   Monetary Damages

Addressing next Jane Doe II's appeal from the denial of damages for the David Wilson "Mormon" incident, we need do no more than simply state our agreement with the district court's assessment of the evidence on that point. Regardless of the

40

outcome of the question whether SFISD truly had a policy of tolerating Establishment Clause abuses, our independent review of the summary judgment record leaves us with no doubt that it is simply devoid of evidence establishing a genuine dispute of material fact that Jane Doe II suffered any compensable harm stemming from Wilson's insensitive and misguided conduct. See Patterson v. P.H.P. Healthcare Corp., 90 F.3d 927, 940 (5th Cir. 1996) (requiring that the evidence "manifest[] some specific discernable injury to the claimant's emotional state"), cert. denied, __ U.S. __, 117 S.Ct. 767 (1997).

G.   Toleration of Establishment Clause Violations

Finally, because we do not disturb the district court's rulings on damages and because we base our decision that the Does are entitled to attorney's fees on our holdings regarding SFISD's graduation and football game prayer policies —— not on a finding that SFISD had a policy of tolerating Establishment Clause violations —— we need not consider SFISD's challenge to the district court's summary judgment ruling on liability for past Establishment Clause violations.


III
CONCLUSION

For the foregoing reasons, we (1) AFFIRM the district court's ruling that the words "nonsectarian, nonproselytizing" are constitutionally necessary components of a viable Clear Creek

41

Prayer Policy; (2) REVERSE that court's holding that SFISD's Clear Creek Prayer Policy can permissibly extend to prayers before (or after) football games; (3) AFFIRM the court's judgment that neither damages nor injunctive relief are appropriate in this case; and (4) REVERSE the district court's denial of attorney's fees for the Does and REMAND this case for determination of reasonable attorney's fees and an award of such fees to the Does, consistent with this opinion.

AFFIRMED in part; REVERSED in part; and REVERSED and REMANDED in part, with instructions.

E. GRADY JOLLY, Circuit Judge, dissenting:

Today, for the first time in our court's history, the majority expressly exerts control over the content of its citizens' prayers. And it does so notwithstanding that the Supreme Court has never required, suggested, hinted, or implied that the Constitution controls the <u>content</u> of citizens' prayers in any context.  To the contrary, Supreme Court precedent clearly indicates that the majority's view transgresses the most fundamental First Amendment rights.  I therefore respectfully dissent.

I

The majority's exegesis contains two primary flaws that allow it to free fall into the black pit of the constitutionally forbidden, that school districts must control the content of graduation prayers to assure that they are "nonsectarian and nonproselytizing."[13]  First, the majority reads <u>Jones v. Clear Creek</u>

---

[13]The nonsectarian, nonproselytizing restriction constitutes viewpoint, not subject matter, discrimination.  Such a restriction clearly allows the subject matter of religion, or ultimate reality, to enter the graduation ceremony.  The majority does not, and indeed could not, disagree with this characterization.  <u>See generally</u> <u>Rosenberger v. Rectors and Visitors of the Univ. of Virginia</u>, 515 U.S. 819, 830-31 (1995); <u>see also</u> <u>Chaudhuri v. Tennessee</u>, 130 F.3d 232, 237 (6th Cir. 1997) (noting that the nonsectarian prayer at issue "evoke[s] a monotheistic tradition not shared" by some religious peoples, including Hindus), <u>cert. denied</u>, 118 S.Ct. 1308 (1998).  Furthermore, it is instructive to note that the term "proselytize" is simply a word used--sometimes pejoratively--in lieu of the term "persuade."  <u>See</u> Webster's Third New International Dictionary at 1821 (defining the verb "proselyte" as "to convert from one religion, belief, opinion, or party to another").  Free market enthusiasts and environmentalists can attempt to "proselytize" as well as Baptists and Mormons.

<u>Indep. Sch. Dist.</u>, 977 F.2d 963 (5th Cir. 1992)[14] in a way that openly oppugns the Supreme Court's reasoning in <u>Lee v. Weisman</u>, 505 U.S. 577 (1992).[15] The Court in <u>Lee</u> clearly held that the nonsectarian nature of a graduation prayer cannot save an otherwise unconstitutional graduation policy from the Establishment Clause. Yet in the face of this holding, the majority nevertheless audaciously concludes that a "nonsectarian, nonproselytizing" requirement constitutes a necessary element to our court's decision upholding the graduation policy in <u>Clear Creek II</u>.

The majority makes its second mistake by failing to recognize that the government may not restrict religious speech based on viewpoint when the government has created a forum for the expression of privately held views.[16] This mistake leads the

---

[14]As a point of nomenclature, our court has in the past referred to this case as <u>Jones II</u>. <u>See, e.g.</u>, <u>Doe v. Duncanville Indep. Sch. Dist.</u>, 70 F.3d 402, 405 (5th Cir. 1995); <u>Ingebretsen v. Jackson Pub. Sch. Dist.</u>, 88 F.3d 274, 278 (5th Cir.), <u>cert. denied</u>, 117 S.Ct. 388 (1996). I join the majority in at least one of several breaks with precedent and refer to the case as <u>Clear Creek II</u>.

[15]The majority omits any mention of the fact that the Supreme Court vacated our decision in <u>Jones v. Clear Creek Indep. Sch. Dist.</u>, 930 F.2d 416 (5th Cir. 1991) (<u>Clear Creek I</u>), <u>vacated</u>, 505 U.S. 1215 (1992), and specifically instructed our court to reconsider the case in the light of <u>Lee</u>. This is the context in which we issued our <u>Clear Creek II</u> opinion.

[16]This mistake is, undoubtedly, a product of the majority's decision to treat the Free Speech Clause as an isolated afterthought. By first engaging in a separate Establishment Clause analysis, the majority virtually preordains the outcome before it

-44-

majority to reach a conclusion, which, however handy and expedient it may be, frustrates the neutral accommodation of religious viewpoints. When the government restricts sectarian and proselytizing religious speech, while embracing ecumenical religious speech, the government has engaged in illegitimate, viewpoint discrimination. That is why the Free Speech Clause is violated when the majority forces a nonsectarian, nonproselytizing requirement upon the speakers. In short, the majority's control over the content of students' prayers achieves the jurisprudentially rare result of offending not only one, but three provisions within the First Amendment.[17]

_____

addresses the Free Speech Clause. This approach fails to acknowledge the complex interaction of the Free Exercise, Establishment, and Free Speech Clauses. One prominent First Amendment scholar has described the source of this complexity in the following way:

> The central feature of the constitutional law of speech and press is a prohibition on "content-based" discrimination, except in the most compelling of circumstances. Yet the distinction between religion and nonreligious ideologies and institutions — a distinction seemingly demanded by the very text of the Religion Clauses — is based on the content of ideas and beliefs. The content-neutral thrust of the Free Speech Clause thus coexists uneasily with the special status of religion under the Free Exercise and Establishment Clauses.

Michael W. McConnell, Religious Freedom at a Crossroads, 59 U. Chi. L. Rev. 115, 118 (1992).

[17]These three provisions, read together, state: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of

Let me try to fit this case into the context of our precedent. The question before us is, quite simply, what was it about the Clear Creek II policy that allowed it to escape the result in Lee? To put the question another way, is it enough for an invocation to be student-elected and student-given, or is the addition of a "nonsectarian, nonproselytizing" content limitation required in order to pass constitutional muster? The majority makes the unprecedented assumption that the content of a speaker's prayer-- specifically, whether the prayer is sectarian or persuasive--can have some effect on its status under the Establishment Clause. Jurists cannot draw many categorical conclusions about the Supreme Court's treatment of the Establishment Clause. Nevertheless, the majority's assumption has the vice of offending one immutable holding of the Court's Establishment Clause jurisprudence: The government may not mitigate Establishment Clause concerns by requiring prayers to be nonsectarian and nonproselytizing. I can locate no place in the Court's extensive Establishment Clause jurisprudence for a "nonsectarian, nonproselytizing" exception to the Clause's command. The additional verbiage was therefore unnecessary in upholding the graduation policy in Clear Creek II.

A

_____

speech . . ."  U.S. CONST. amend. I.

I begin with some first principles. From its earliest forays into interpretation of the Establishment Clause, the Court consistently characterized it as prohibiting more than the direct establishment of a single national (or, after Cantwell v. Connecticut, 310 U.S. 296 (1940), and Everson v. Board of Educ., 330 U.S. 1 (1947), state) church. See, e.g., Davis v. Beason, 133 U.S. 333, 342 (1890) (noting that "[t]he first amendment to the Constitution . . . was intended . . . to prohibit legislation for the support of any religious tenets, or the modes of worship of any sect"); Reynolds v. United States, 98 U.S. 145, 164 (1878) (holding that "Congress was deprived of all legislative power over [religious] opinion" by the Clause); Watson v. Jones, 80 U.S. (13 Wall.) 679, 730 (1871) (noting that the Clause serves both to "'rescue[] the temporal institutions from religious interference,'" and to "'secure[] religious liberty from the invasion of the civil authority'") (quoting Harmon v. Dreher, 17 S.C. Eq. (Speer's Eq.) 87, 120 (S.C. 1843)); Terrett v. Taylor, 13 U.S. (9 Cranch) 43, 52 (1815).

The Court's modern jurisprudence has continued the tradition set by the early cases, and makes clear that the Establishment Clause paints in broad prohibitive strokes when it comes to state or federal action in the spiritual domain. As Justice Black explained in Everson:

The "establishment of religion" clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. . . . Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa.

330 U.S. at 15-16; see also Lee, 505 U.S. at 602 (Blackmun, J., joined by Stevens & O'Connor, JJ., concurring) (noting that the modern Court "'has consistently held that the clause withdrew all legislative power respecting religious belief or the expression thereof'") (quoting School Dist. v. Schempp, 374 U.S. 203, 222 (1963)).

In Engel v. Vitale, 370 U.S. 421 (1962), this broadly proscriptive reading of the Establishment Clause was applied for the first time to the particularly sensitive area of school prayer. The controversy concerned a short prayer selected by the State Board of Regents for students to read aloud at the beginning of the school day.[18] Stating that "[n]either the fact that the prayer may be denominationally neutral nor the fact that its observance on the part of the students is voluntary can serve to free it from the limitations of the Establishment Clause," the Supreme Court struck it down as an unconstitutional attempt by the State to use "the

---

[18]The prayer read in full: "Almighty God, we acknowledge our dependence upon Thee, and we beg Thy blessings upon us, our parents, our teachers and our Country." 370 U.S. at 422.

power, prestige and financial support of government" to exert "indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion." Engel, 370 U.S. at 430-31. But for today's majority, not to worry.

B

Yet Lee, the most recent and relevant precedent, continues to maintain and extends this broadly proscriptive reading of the Clause, and refutes the notion that a government-sponsored, "nonsectarian, nonproselytizing" prayer might be any less constitutionally deficient than a sectarian, proselytizing one. Addressing the almost identical contention in that case--that the invocation at issue was constitutionally sound because the school directed it to be nonsectarian and nonproselytizing--the Court stated:

> We are asked to recognize the existence of a practice of nonsectarian prayer, prayer within the embrace of what is known as the Judeo-Christian tradition, prayer which is more acceptable than one which, for example, makes explicit reference to the God of Israel, or to Jesus Christ, or to a patron saint. There may be some support, as an empirical observation, to the statement . . . that there has emerged in this country a civic religion, one which is tolerated when sectarian exercises are not. If common ground can be defined which permits once conflicting faiths to express the shared conviction that there is an ethic and a morality which transcend human invention, the sense of community and purpose sought by all decent societies might be advanced. . . . Though the efforts of the school officials in this case to find common ground appear to have been a good-faith attempt to recognize the common aspects of religions and not the divisive ones, our precedents . . . caution us to measure

the idea of a civic religion against the central meaning of the Religion Clauses of the First Amendment, which is that all creeds must be tolerated and none favored. The suggestion that government may establish an official or civic religion as a means of avoiding the establishment of a religion with more specific creeds strikes us as a contradiction that cannot be accepted.

505 U.S. at 589-90 (emphasis added). Today's majority opinion lacks any attempt to address this authoritative reasoning, which seems to be so at odds with its holding.[19] However, like boys on a summer night blithely whistling as they walk through a graveyard, for the panel majority it is not to worry so long as it is brave enough to look straight ahead and pretend that authoritative precedents are merely ghosts of the past not to be feared.

Indeed, the majority's opinion reveals a willful aversion to accommodating the respective reasoning of Lee and Clear Creek II. See, e.g., ante at 35 (finding that the district court judge "clearly err[ed]" in defining nonsectarian to include reference to "specific deities" when Clear Creek II, 977 F.2d at 967, upheld a policy under which students may "employ the name of any deity"); ante at 26 (relying on another circuit's case that expressly disagreed with our own Clear Creek II precedent, and doing so in the midst of explaining why the reasoning of Clear Creek II could

---

[19]Baffling indeed is the majority's "cf." citation, ante at 24, to pages 588-90 of Lee. In those pages, the Court explicitly rejects the idea that the nonsectarian nature of a prayer mitigates any Establishment Clause problems.

not possibly rest on the fact that the policy created a limited public forum); ante at 32 n.11 (describing <u>Clear Creek II</u> as a case taking our First Amendment jurisprudence one step closer to the brink of a cliff); ante at 18 (feigning "obeisance to the ineluctable precedent of <u>Clear Creek II</u>").  To avoid the real issues presented in this case, the majority must paper over the unmistakable language in cases like <u>Lee</u> and <u>Engel</u>.  It is beyond argument, however, that the Supreme Court's consistent interpretation of the Establishment Clause allows no exception for the nonsectarian and nonproselytizing prayer.  The Clause prohibits the establishment of religion and, as interpreted by the Supreme Court, it denies government the ability to favor a composite ecumenical religion just as surely as it denies the ability to favor some select one of its components.  The majority's contention that the words "nonsectarian, nonproselytizing" could somehow save an otherwise unconstitutional policy in this case is a regrettable expediency.[20]

---

[20]And despite any implications in <u>Clear Creek II</u> to the contrary.  Although we did note in <u>Clear Creek II</u> that having a nonsectarian, nonproselytizing requirement might serve to "minimize any . . . advancement of religion," the argument was clearly cumulative in nature.  <u>See</u> <u>id.</u>, 977 F.2d at 967.  Furthermore, the point was made exclusively in the context of one prong of the <u>Lemon</u> test.  <u>See</u> <u>Lemon v. Kurtzman</u>, 403 U.S. 602, 612-13 (1971).  Although the Supreme Court has yet specifically to overrule <u>Lemon</u>, <u>see</u> <u>Lamb's Chapel v. Center Moriches Union Free Sch. Dist.</u>, 508 U.S. 384, 395 & n.7 (1993), a strict application of the case is of doubtful continuing relevance in this context, having been largely

abandoned in favor of the "coercion" and "endorsement" tests of <u>Lee</u> and <u>Allegheny</u>.

In <u>Lee</u>, for example, the Court struck down the graduation prayer policy at issue on the sole basis that it was an unconstitutional coercion of participation in a religious exercise. <u>See</u> <u>id.</u>, 505 U.S. at 599. Two concurrences would have found an unconstitutional endorsement as well, <u>see</u> <u>id.</u> at 604-05 (Blackmun, J., joined by Stevens & O'Connor, JJ., concurring); <u>id.</u> at 630-31 (Souter, J., joined by Stevens & O'Connor, JJ., concurring), but only three Justices, O'Connor, Stevens, and the since-departed Justice Blackmun, bothered to so much as recite the elements of the <u>Lemon</u> test. <u>See</u> <u>id.</u> at 602-03 & n.4. Even this limited acknowledgment was ambivalent, however, as the discussion that followed addressed the sole question whether the government "'plac[ed] its official stamp of approval' on the prayer"--and that is just the endorsement test rephrased. <u>See</u> <u>id.</u> at 603 (quoting <u>Engel</u>, 370 U.S. at 429). The dissenters in <u>Lee</u> would have found no constitutional fault at all based on a historical/coercion approach to the problem, <u>see</u> <u>id.</u> at 632-46 (Scalia, J., joined by Rehnquist, CJ., and White & Thomas, JJ., dissenting), which prompted Justice Scalia to declare that "[t]he Court today demonstrates the irrelevance of <u>Lemon</u> by essentially ignoring it . . . and the interment of that case may be the one happy byproduct of the Court's otherwise lamentable decision." <u>Id.</u> at 644. <u>See also</u> <u>Rosenberger</u>, 515 U.S. at 837-46 (omitting any mention of <u>Lemon</u> whatsoever when analyzing an Establishment Clause challenge).

Even before <u>Lee</u>, however, <u>Lemon</u> had long since been pushed into a small corner of the Court's jurisprudence. In both <u>County of Allegheny v. ACLU</u>, 492 U.S. 573 (1989), and <u>Board of Educ. of Westside Community Sch. v. Mergens</u>, 496 U.S. 226 (1990), the Court's two most significant Establishment Clause cases leading up to <u>Lee</u>, the <u>Lemon</u> test failed to command a majority. As in <u>Lee</u>, the primary analysis of each majority, plurality, concurring, and dissenting opinion in those cases ultimately turned on the principles of endorsement and/or coercion--not on any strict application of the <u>Lemon</u> test. <u>See</u> <u>Allegheny</u>, 492 U.S. at 593-94 (stating that "[w]hether the key word is 'endorsement,' 'favoritism,' or 'promotion,' the essential principle remains the same . . . [t]he Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief"); <u>id.</u> at 627 (O'Connor, J., joined in part by Brennan & Stevens, JJ., concurring in part and in the judgment) (stating that "the endorsement test captures the essential command of the Establishment Clause"); <u>id.</u> at 638 (Brennan, J., joined by

Marshall & Stevens, JJ., concurring in part and dissenting in part) (agreeing that the Establishment Clause should be interpreted to assure that government neither "signals an endorsement of" nor "shows favoritism towards" religion); id. at 650 (Stevens, J., joined by Brennan & Marshall, JJ., concurring in part and dissenting in part) (noting that "[w]hether the vice . . . is characterized as 'coercion,' or 'endorsement,' or merely as state action with the purpose and effect of providing support for specific faiths, it is common ground that . . . symbolic government speech 'respecting an establishment of religion' may violate the Constitution") (citations omitted); id. at 655-79 (Kennedy, J., joined by Rehnquist, CJ., and White & Scalia, JJ., concurring in the judgment in part and dissenting in part) (advancing the coercion test); Mergens, 496 U.S. at 250 (finding the Equal Access Act, 20 U.S.C. § 4071 et seq., constitutional because "secondary students are . . . likely to understand that a school does not endorse or support student [religious] speech that it merely permits on a nondiscriminatory basis"); id. at 260-61 (Kennedy, J., joined by Scalia, J., concurring in part and in the judgment) (finding the Act constitutional on the basis that "[n]othing on the face of the Act or in the facts of the case . . . demonstrates that enforcement of the statute will result in the coercion of any student to participate in a religious activity"); id. at 266 (Marshall, J., joined by Brennan, J., concurring in the judgment) (noting concern for the "appearance of school endorsement" of religious views caused by the procedures permitted under the Act); id. at 287 (Stevens, J., dissenting) (not reaching the constitutional issue, but noting endorsement and coercion concerns).

Finally, Justice Scalia's assessment of Lee's effect on Lemon has been sanctioned by another (post-Lamb's Chapel) panel of this court. See Doe v. Duncanville Indep. Sch. Dist., 994 F.2d 160, 166 n.7 (5th Cir. 1993) (eschewing "Lemon analysis in favor of a more case-bound approach" because, although normally "'it is neither [this court's] object nor [its] place to opine whether the Court's Establishment Clause jurisprudence is good, fair, or useful,' . . . recent indications suggest that the Court agrees with [a terminal] assessment of Lemon, essentially ignoring it in Lee in favor of the school prayer cases") (quoting Jones, 977 F.2d at 966, and citing to Justice Scalia's dissent in Lee); see also Bauchman v. West High School, 132 F.3d 542, 551-52 (10th Cir. 1997) ("Justice O'Connor's 'endorsement test' is now widely accepted as the controlling analytical framework for evaluating Establishment Clause claims."), cert. denied, 118 S.Ct. 2370 (1998); but see

III

Furthermore, the inclusion of a "nonsectarian, nonproselytizing" content limitation offends a particularly longstanding and independent constitutional doctrine upon which the Clear Creek II decision must and does rely: the principle of neutral accommodation.

A

In Everson, Justice Black expressly noted that the courts must "be sure that [they] do not inadvertently prohibit [government] from extending its general . . . benefits to all . . . citizens

Helms v. Picard, 151 F.3d 347, 362 (5th Cir. 1998) ("[T]he Supreme Court has not abandoned, nor even fundamentally changed, the Lemon test."), amended No. 97-30231, 1999 WL 11488 (Jan. 13, 1999).

     Even if the Supreme Court has not yet effectively abandoned the Lemon test, the majority's insistence that schools bar sectarian and proselytizing prayers would surely fail Lemon's excessive entanglement test. Compare, Ingebretsen v. Jackson Pub. Sch. Dist., 88 F.3d at 279 (to the extent that a statute requires school officials to review the content of prayers to ensure that they meet nonsectarian and nonproselytizing requirements, that statute excessively entangles government with religion); Lee, 505 U.S. at 617 (Souter, J., concurring) (describing as "undefinable" the point at which a state-approved, ecumenical prayer becomes so closely identified with the sacred text of a specific religion that a breach of the Establishment Clause has occurred); and Widmar v. Vincent, 454 U.S. 263, 272 n.11 (1981) (finding that a university would entangle itself with religion by attempting to exclude "religious speech" because enforcing that exclusion would require officials to distinguish between religious and nonreligious speech); with Clear Creek II, 977 F.2d at 968 (stating that "we know of no authority that holds yearly review of unsolicited material for sectarianism and proselytization to constitute excessive entanglement").

without regard to their religious belief" by being overzealous in their enforcement of the Establishment Clause.  330 U.S. at 16. This concern was explicated with some eloquence by Justice Douglas in the following case of <u>Zorach v. Clauson</u>, 343 U.S. 306 (1952):

> We are a religious people whose institutions presuppose a Supreme Being.  We guarantee the freedom to worship as one chooses.  We make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary.  We sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma.  When the state . . . cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions.  For it then respects the religious nature of our people and accommodates the public service to their spiritual needs.  To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups.  That would be preferring those who believe in no religion over those who do believe.  Government may not finance religious groups nor undertake religious instruction nor blend secular and sectarian education nor use secular institutions to force one or some religion on any person. But we find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence.

343 U.S. at 313-14; <u>see also</u> <u>Committee for Public Educ. & Religious Liberty v. Nyquist</u>, 413 U.S. 756, 792-93 (1973) (stating that "[a] proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of neutrality toward religion"); <u>Wallace v. Jaffree</u>, 472 U.S. 38, 60 (1985)

(interpreting the Clause, similarly, as requiring government to "pursue a course of complete neutrality toward religion").

Adapting this "neutral accommodation" principle to the scholastic setting, in Widmar v. Vincent, 454 U.S. 263, 273-74 (1981), the Court held that it was not a violation of the Establishment Clause for a public university to allow a religious student group to take advantage of the university's general policy of allowing registered student groups to use university facilities for their meetings on a neutral and nondiscriminatory basis. Reasoning that the university had created a designated public forum by making the facilities "generally open for use by student groups," the Court clarified that, in general, "an open forum in a public university does not confer any imprimatur of state approval on religious sects or practices" that make use of the forum. Id. at 267, 274.

Following up on Widmar, in 1984, Congress enacted the Equal Access Act, 20 U.S.C. § 4071 et seq., to make the neutral accommodation principle expressly applicable to the secondary public schools. Upholding the Act as constitutional under the Establishment Clause, the Court noted in Mergens that:

> [T]here is a crucial distinction between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect. We think that secondary school students are mature enough and are likely to understand that a school does not endorse or

> support [religious] student speech that it merely permits
> on a nondiscriminatory basis.  The proposition that
> schools do not endorse everything they fail to censor is
> not complicated.

496 U.S. at 250 (citations omitted).  The majority fails to appreciate this "crucial distinction" between government speech endorsing religion and private speech endorsing religion when it reads Clear Creek II as requiring school policies to adopt the nonsectarian, nonproselytizing requirements.

B

This distinction was not lost on the Clear Creek II panel. Clear Creek II is indeed a case about neutral accommodation, and relies on a central principle of Establishment Clause jurisprudence.[21]  In upholding the policy under consideration in

---

[21]This principle of neutral accommodation is fully consistent with and anticipated by Lee, see id., 505 U.S. at 598-99 ("We recognize that, at graduation time and throughout the course of the educational process, there will be instances when religious values, religious practices, and religious persons will have some interaction with the public schools and their students.") (citing Mergens); id. at 630 n.8 (Souter, J., joined by Stevens & O'Connor, JJ., concurring) ("If the State had chosen its graduation day speakers according to wholly secular criteria, and if one of those speakers (not a state actor) had individually chosen to deliver a religious message, it would have been harder to attribute an endorsement to the State."), and has been both sustained and augmented by the Court's more recent cases.  See, e.g., Rosenberger, 515 U.S. at 842 (stating, once again, that "[i]t does not violate the Establishment Clause for a public university to grant access to its facilities on a religion-neutral basis to a wide spectrum of student groups, including groups which use meeting rooms for sectarian activities"); Capitol Square Review and Advisory Board v. Pinette, 515 U.S. 753, 766 (1995) (plurality) ("Religious expression cannot violate the Establishment Clause

Clear Creek II, we expressly noted that, "unlike the policy at issue in Lee, [the Clear Creek II policy] does not mandate a prayer." 977 F.2d at 968. Although conceding that the policy allows for "supplications to a deity," we clarified that it also "permits invocations free of all religious content." Id. at 969.[22] Relying expressly on Mergens's proposition that "there is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect," we concluded that the policy was an essentially neutral directive

where it (1) is purely private and (2) occurs in a traditional or designated public forum, publicly announced and open to all on equal terms."); Board of Education v. Grumet, 512 U.S. 687, 696 (1994) ("'A proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of neutrality toward religion,' favoring neither one religion over others nor religious adherents collectively over nonadherents.") (quoting Nyquist, 413 U.S. at 792-93); Zobrest v. Catalina Foothills Sch. Dist., 509 U.S. 1, 8 (1993) (noting that "government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion are not readily subject to an Establishment Clause challenge," for, if the reverse were true, "then 'a church could not be protected by the police and fire departments, or have its public sidewalk kept in repair'") (quoting Widmar, 454 U.S. at 274-75).

[22]On this point, it is important to note that Clear Creek II clearly rests on an interpretation of "invocation" and "benediction" that is itself free of all religious content. Clear Creek II, 977 F.2d at 969. This fact goes some way towards distinguishing the result in Clear Creek II from the contrary decision of the Third Circuit in ACLU v. Black Horse Pike Req'l Bd. of Educ., 84 F.3d 1471 (3d Cir. 1996) (en banc), where the challenged policy provided for a student-elected, student-given, "invocation and benediction prayer." Id. at 1475 (emphasis added).

of accommodation for private religious and other speech that neither favored nor disfavored religion on its face, and was therefore not unconstitutional.  Id.

C

Because it is clear that Clear Creek II relies on Mergens's neutral accommodation principle to escape the proscriptive effect of Lee, we need only apply that principle to the facts before us.

1

We have expressly stated that for the Constitution to require neutral accommodation of religious speech, the government must have established at least what has been called a "limited public forum." Duncanville, 994 F.2d 164-65.[23]  As the majority points out, a "limited public forum" is one of several types of fora recognized by the Supreme Court.  The other categories of fora include traditional public, designated public, and nonpublic fora.  The majority errs, however, by failing to understand the difference between a "designated public forum" and a "limited public forum." The government creates a designated public forum when it "has intentionally designated a place or means of communication as a public forum."  Cornelius, 473 U.S. at 800.  A subset of designated public fora is the "limited public forum."  Such a forum is created

_____

[23]But see Lamb's Chapel, 508 U.S. at 392-93 (suggesting, prior to our decision in Duncanville, that even in a nonpublic forum, the neutral accommodation principle applies).

when the government limits the purpose of the forum by, for example, placing a limitation on use by certain groups or on the discussion of certain subjects. Perry, 460 U.S. at 45 n.7; Brody v. Spang, 957 F.2d 1108, 1118 (3d Cir. 1992) (describing a limited public forum as "a subset type of forum, whose scope is circumscribed either by subject matter or category of speaker"); Travis v. Owego-Apalachin School Dist., 927 F.2d 688, 692 (2d Cir. 1991) (describing a limited public forum as a sub-category of the designated forum that the government creates when it opens a nonpublic forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects).

SFISD's policy only limits the benedictions or invocations by limiting the potential class of speakers to graduating students. Contrary to the majority's assertion, the policy in this facial challenge does not require that the messages have a religious component. Neither the dictionary definitions cited by the majority, ante at 30, nor our own precedents require an interpretation of "invocation" or "benediction" grounded in religion. See Clear Creek II, 977 F.2d at 969 (interpreting the terms "invocation" and "benediction" in a way that is free from all religious content). Furthermore, SFISD's policy grants absolute access to the graduation podium to any student speaker that the senior class elects; once the class of elected student speakers is

chosen, SFISD maintains no power, discretionary or otherwise, to bar any duly chosen speaker from accomplishing his task. Because the policy effectuates this relinquishment of control, the policy unmistakably creates a limited public forum and the majority cannot make it otherwise.

In arguing that SFISD has not created a "true" forum, the majority states its ex cathedra view that a graduation ceremony is not an appropriate place for communication of views on issues of political and social significance. Ante at 29. Historical facts, of course, contradict the majority's view. While graduation ceremonies do not often exhibit "duelling presentations," they almost always include speakers attempting to impart wisdom and reflect on life's higher (that is, morally superior) goals. Furthermore, graduation ceremonies often play host to controversial public figures. See, e.g., Lydia Lum, *Commencement Time Begins as Politicians Head List of Speakers*, HOUSTON CHRONICLE, May 4, 1998, at 16 (stating that "commencement speakers . . . vary from year to year, but 1998 apparently is the Year of the Politician."). Finally, our country's public schools have, of course, a long tradition of hosting religious prayers at graduation ceremonies. Lee, 505 U.S. at 635-36 (Scalia, J., dissenting). In sum, graduation ceremonies have often presented a forum for expressing

the most profound of thoughts on society, politics, religion, and the nature of humankind.[24]

Besides its failure to properly distinguish between designated and limited public fora, the majority further errs by applying precedent that is inapplicable to the case at hand. The cases upon which the majority relies for guidance in its forum analysis--

---

[24]The majority cites only one case in support of its rigid view that a graduation ceremony (or portions thereof) could not constitute a public forum. In its citation of, and quotation from, that case the majority takes more liberties than should be allowable. In quoting Brody v. Spang, the majority panhandles a remote district court's musings as Third Circuit law without proper attribution. The quotation reads,

> Graduation ceremonies have never served as forums for public debate or discussions, or as a forum through which to allow varying groups to voice their views.

Ante at 29 (quoting Brody v. Spang, 957 F.2d 1108, 1119-20 (3d Cir. 1992) (quoting Lundberg v. West Monona Community Sch. Dist., 731 F. Supp. 331 (N.D. Iowa 1989))). But the Brody court did not indicate any agreement in quoting the Iowa district court. In fact, the Brody court followed its discussion of Lundberg with the following statement:

> Nonetheless, it is certainly possible that the commencement exercises at Downingtown Senior High School could qualify as a public forum, and nothing in the present record demonstrates otherwise. More specifically, although the terms of the consent decree [at issue in this case] suggest that the pool of potential graduation speakers is confined to members of the school community and invited guests, this simply indicates that any forum created is a limited one, and does not preclude a finding that the ceremony has been designated as a public forum.

Brody, 957 F.2d at 1120 (citing Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 267 (1988)).

Cornelius, Perry, Forbes, Estiverne, Muir and Hobbs--all dealt with "as-applied" challenges in which the defendants (governmental entities) applied their policies to bar forum access to those wishing to express the ideas that the plaintiffs sought to communicate. Here, in this facial challenge, SFISD has not applied its policy to bar anyone or any expression. Instead, its policy invites expression, restricted only by time, place, and manner.

Here, we address a facial challenge to a policy under which the school district argues that it has indeed established a public forum. A facial challenge requires that we must not condemn the policy unless there is no way to implement it in a constitutional manner. Clear Creek II, 977 F.2d at 969; cf. United States v. Salerno, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."); see also Doe v. Madison Sch. Dist. No. 321, 147 F.3d 832, 836 & n.6 (9th Cir. 1998) (refusing to view a school district's intentions skeptically when analyzing a facial challenge to a graduation policy). The difference between facial challenges and "as-applied" challenges is critically important, and yet the majority has erroneously decided to treat them identically. This error, in turn, causes the majority to stumble through the inappropriate

process of applying forum tests and factors wholly inapplicable in the context of this appeal.  See, e.g., ante at 28 (attempting to apply the factor of "governmental intent," but then stating that (in this facial challenge) "the government's proffered intent does not govern this inquiry"); ante at 30-31 (analyzing the "extent of the use granted" factor when the policy has never been implemented).[25]

But the SFISD policy clearly survives a facial challenge. When a policy creating a forum places no barriers other than reasonable time, place, and manner restrictions on the speech, that policy creates a public forum.[26]  As already stated, the SFISD policy only limits the class of potential speakers to graduating students; this lone restriction merely requires us to characterize the forum as a "limited" public forum.

2

---

[25]As these citations reveal, the majority applies factors designed for use in analyzing "as-applied" challenges to government restrictions on speech when the plaintiff has brought a facial challenge to a policy not yet implemented.

[26]See, e.g., Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) ("[E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided [that] the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'") (quoting Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 (1984)).

Even if the SFISD policy did not create a limited public forum, the majority's decision to accept ecumenical prayers while barring other prayers contradicts established First Amendment law. Once the government creates a forum--whether a traditional public forum, a limited public forum, or even a nonpublic forum--and lets in some religious viewpoint, the government may not then exclude any other religious viewpoint. In other words, the government must neutrally accommodate all religious viewpoints once any one religious viewpoint (e.g., an ecumenical viewpoint) has entered the forum.

This result is dictated by the Supreme Court's consistent rule that even in nonpublic fora, the government may not engage in viewpoint discrimination. See Perry, 460 U.S. at 46 (government may not discriminate based on viewpoint in even a nonpublic forum); Cornelius, 473 U.S. at 806 ("Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.") (emphasis added and citation omitted); Hobbs v. Hawkins, 968 F.2d 471, 481 (5th Cir. 1992) ("viewpoint discrimination violates the First Amendment regardless of the forum's classification"). Of utmost importance to the instant case, the Supreme Court has applied this hard and fast rule in the realm of religious speech. In the midst of

chastising a school district's decision to exclude a religious group from using school premises solely because of the group's religious viewpoint, the Supreme Court stated that

> denial on that basis was plainly invalid under our holding in <u>Cornelius</u> that although a speaker may be excluded from a non-public forum if he wishes to address a topic not encompassed within the purpose of the forum . . . or if he is not a member of the class of speakers for whose especial benefit the forum was created . . . , the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.

<u>Lamb's Chapel</u>, 508 U.S. at 394 (quotation marks and citations omitted; placement of ellipses in original). It is not surprising that the Supreme Court has applied this prohibition against viewpoint restriction to religious speech. The Court has stated in graphic and certain terms that the First Amendment's Free Speech Clause fully applies to religious speech:

> Our precedent establishes that private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private religion. Indeed, in Anglo-American history, at least, government suppression of speech has so commonly been directed precisely at religious speech that a free-speech clause without religion would be Hamlet without the prince. Accordingly, we have not excluded from free-speech protections religious proselytizing, or even acts of worship.

<u>Pinette</u>, 515 U.S. at 760 (citations omitted).

In sum, even if we assume that the graduation policy creates only a nonpublic forum, the government may place some reasonable

restrictions on the speech but it most assuredly cannot restrict speech because of its viewpoint.  Thus, the majority creates a subset of constitutional violations when it allows the school district to create a forum where students can offer ecumenical prayers, but not the prayers of any other religion.[27]  See American Civil Liberties Union v. Black Horse Pike Req'l Bd. of Ed., 84 F.3d 1471, 1492 (3d Cir. 1996) (Mansmann, J., dissenting) (contrasting the Clear Creek II policy with another policy that "is more liberal in that it extends the scope of its toleration to include even sectarian prayer, if the graduates so choose," and concluding that the latter policy "comports with the First Amendment's prohibition against the inhibition of the practice of religion or of free expression").  Whatever criticisms one may make of the reasoning

---

[27]Lamb's Chapel and Pinette positively suggest that a "nonsectarian, nonproselytizing" content limitation is itself unconstitutional in this setting.  See Lamb's Chapel, 508 U.S. at 394 (noting that "'government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses,'" and holding that a requirement of no religious content constitutes such an impermissible viewpoint restriction) (quoting Cornelius, 473 U.S. at 806); Pinette, 515 U.S. at 766 (stating that "giving sectarian religious speech preferential access to a forum . . . would violate the . . . Free Speech Clause, since it would involve a content limitation," and thereby implying that the reverse would also be true).  Although Clear Creek II clearly held that a "nonsectarian, nonproselytizing" content limitation was constitutionally permissible in the context of a limited public forum, see Clear Creek II, 977 F.2d at 967 & 971, Lamb's Chapel and Pinette are subsequent decisions of the Supreme Court, so it would appear that this holding has been overruled.

in Clear Creek II,[28] there can be no contention that a content limitation would in any way improve the situation. It is therefore clear to me that the district court erred in requiring SFISD to incorporate these additional restrictions into their policy.

IV

Now we come to the remarkable holding of the majority that, for the most curious reasons, the First Amendment allows speech at graduation ceremonies but bars speech at sporting events. In short, there is a total absence of merit to the contention that the Football Policy might be constitutionally deficient when the graduation policy is not.[29] As I have tried to explain, the reason

---

[28]Although the question is not before us, courts and commentators have criticized the idea that an elected class could qualify either as "religion neutral" or even as a proper class for public forum and Mergens purposes. See, e.g., Doe v. Madison Sch. Dist. No. 321, 147 F.3d 832, 834 n.7 (9th Cir. 1998) (finding selection by grade point a superior method in this regard); Black Horse, 84 F.3d at 1477-78; Recent Case, 110 Harv. L. Rev. 781, 783-84 (1997); Rick A. Swanson, Time for a Change: Analyzing Graduation Invocations and Benedictions under Religiously Neutral Principles of the Public Forum, 26 U. Mem. L. Rev. 1405, 1422-25, 1432-33 & n.95 (1996); cf. Widmar, 454 U.S. at 275 (making explicit exception for the situation where "empirical evidence [shows] that religious groups will dominate the forum"); Pinette, 515 U.S. at 766 (noting that "one can conceive of a[n unconstitutional] case in which the governmental entity manipulates its administration of the public forum in such a manner that only certain religious groups take advantage of it"); Clear Creek II, 977 F.2d at 969 (stating that "[w]e can imagine discriminatory methods of implementing the [policy] that would make it a tool for governmental endorsement of religion").

[29]The Football Policy states:

-68-

a <u>Clear Creek II</u> policy works is that it neutrally accommodates both religious and nonreligious speech in a limited public forum. Constitutionally speaking, there are no location or other restrictions on where the state may elect to create its designated or limited public fora, <u>see</u> <u>Estiverne</u>, 863 F.2d at 376. It follows therefore that if the school policy at issue facially creates a limited public forum, that policy (here, the Football Policy) necessarily passes constitutional muster to allow the designated class of speakers to engage in both religious and non-religious

---

The board has chosen to permit students to deliver a brief invocation and/or message to be delivered during the pre-game ceremonies of home varsity football games to solemnize the event, to promote good sportsmanship and student safety, and to establish the appropriate environment for the competition.

Upon advice and direction of the high school principal, each spring, the high school student council shall conduct an election, by the high school student body, by secret ballot, to determine whether such a statement or invocation will be a part of the pre-game ceremonies and if so, shall elect a student, from a list of student volunteers, to deliver the statement or invocation. The student volunteer who is selected by his or her classmates may decide what message and/or invocation to deliver, consistent with the goals and purposes of this policy.

Like the graduation policy, the Football Policy contains a fallback provision that goes into effect if a court enjoins the enforcement of the primary policy provisions. If this occurs, the policy goes into effect with the following sentence added to the last paragraph:

Any message and/or invocation delivered by a student must be nonsectarian and nonproselytizing.

speech.  But see Jager v. Douglas County Sch. Dist., 862 F.2d 824
(11th Cir. 1989) (finding "equal access" policy for football game
invocations unconstitutional, but without reference to public forum
analysis and in the apparent assumption that the "invocations" at
issue were certain to be religious in content).

On the other hand, the majority, which apparently feels
measurable discomfort with our precedent, takes the Football Policy
as an opportunity to break free from the constraints of Clear Creek
II, and argues that, unlike graduation ceremonies, football games
lack solemnity, which, the majority concludes, undermines any
legitimate reasons for the policy's application to such sporting
events.[30]  It may well be headline news to the majority, but a
"solemn" ceremony is not the only occasion when many citizens feel
the need for serious thoughts and words.  Of course, football games
do not possess the solemnity of a graduation ceremony.  But that
fact has all the relevance to our First Amendment discussion today
as the fact that a hog was slaughtered to make SFISD's football.
There are in fact several secular reasons for allowing a brief,
serious message before football games--some of which SFISD has
listed in its policy.  At sporting events, messages and/or

---

[30]The majority also claims to find support in Doe v.
Duncanville Indep. Sch. Dist., 70 F.3d 402 (5th Cir. 1995), for
striking the Football Policy.  But Duncanville was an entirely
different case, involving private prayers among team members--not
"public" prayers or messages in any sense.

invocations can promote, among other things, honest and fair play, clean competition, individual challenge to be one's best, importance of team work, and many more goals that the majority could conceive would it only pause to do so.

Having again relinquished all editorial control, SFISD has created a limited public forum for the students to give brief statements or prayers concerning the value of those goals and the methods for achieving them. As with the graduation messages, there will be no "dueling debates." But make no mistake, whatever the subject--whether it be sportsmanship, the value of winning, the importance of safety, etc.--students will have different views on the subjects to be expressed. Because the SFISD policy does nothing to discriminate based on viewpoint, and certainly does not direct any particular viewpoint (religious or secular), the primary SFISD Football Policy does not violate the First Amendment.

V

Our court's dalliance in prayer-writing will not, unfortunately, end with this case. Now that we have required prayers to be nonsectarian and nonproselytizing in content, we undoubtedly will have to give definition to those terms. This will prove no easy task. In Lee, the rabbi's benediction read in part:

> The graduates now need strength and guidance for the future, help them to understand that we are not complete with academic knowledge alone. We must each strive to

fulfill what You require of us all: To do justly, to love mercy, to walk humbly.

As Justice Blackmun pointed out, the last sentence of this excerpt includes a direct quotation of Judeo-Christian scripture.[31] Lee, 505 U.S. at 604, n.5 (Blackmun, J., concurring). Because the Court refused to find that the nonsectarian nature of a prayer could save it from Establishment Clause scrutiny, the Court did not need to decide whether this oration qualifies as nonsectarian or nonproselytizing. Our court will have to decide such issues.[32] If the prayer calls upon "Father" instead of "God," will we intervene? (Must the invocation be gender-neutral?) See Chaudhuri v. Tennessee, 130 F.3d 232, 241 n.2 (6th Cir. 1997) (Jones, J., concurring and dissenting) (noting that the supplication to "'Heavenly Father' contains a package of religious bias"), cert. denied, 118 S.Ct. 1808 (1998). If a student begins his benediction message by saying, "Blessed be He who decked the sky with constellations and set in it a lamp and a shining moon"[33] will we

---

[31]The quote is from the Book of the Prophet Micah, ch. 6, v. 8 ("He has showed you, O man, what is good. And what does the Lord require of you? To act justly and to love mercy and to walk humbly with your God.").

[32]Cf. Rosenberger, 515 U.S. at 835 ("The first danger to liberty lies in granting the State the power to examine publications to determine whether or not they are based on some ultimate idea and, if so, for the State to classify them.").

[33]The Koran, Al-Furqan 25:63, at 256 (N.J. Dawood trans., Penguin Books 1997).

characterize this direct quotation of the Koran as sectarian and proselytizing?  Our court's evolving prayer control will fashion the standard utterance at high school graduations throughout our Circuit: as students grope for a lawful way to express their most deeply held beliefs, on one of the most ceremonious days in their young lives, they will offer up the Fifth Circuit Court of Appeals's prayer.

The majority fails to realize that what is at issue in this facial challenge to this school policy is the neutral accommodation of non-coerced, private, religious speech, which allows students, selected by students, to express their personal viewpoints.  The state is not involved.  The school board has neither scripted, supervised, endorsed, suggested, nor edited these personal viewpoints.  Yet the majority imposes a judicial curse upon sectarian religious speech.  Because I believe that this result is at war with three clauses within the First Amendment, I respectfully dissent.